UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS, ILLINOIS

| | |
|---|---|
| MATTHEW WIGGENHORN, individually and on behalf of all others similarly situated,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>AXA EQUITABLE LIFE INSURANCE COMPANY )<br>F/K/A THE EQUITABLE LIFE ASSURANCE  )<br>SOCIETY OF THE UNITED STATES,  )<br>)<br>Defendant.  ) | No. 04-372-DRH<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Plaintiff MATTHEW WIGGENHORN, individually and on behalf of others similarly situated, states as follows for his First Amended Complaint against AXA EQUITABLE LIFE INSURANCE COMPANY F/K/A THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES ("EQUITABLE LIFE"):

**THE PARTIES**

1. Plaintiff MATTHEW WIGGENHORN is a resident of Bethalto, Illinois, in Madison County.

2. At all times relevant to this Complaint, Plaintiff owned an Incentive Life 2000 Flexible Premium Variable Life Policy issued by Defendant Equitable and has held units in the Incentive Life 2000 Flexible Premium Variable Life Policy.

3. EQUITABLE LIFE is a New York corporation with its principal place of business in New York, New York.

4. Equitable Life maintains investor relationships with clients in Madison County, Illinois, communicates regularly with them by mail and maintains an interactive website to communicate with clients, including clients in Madison County.

5. The transactions which are the subject of this Complaint occurred in part in Madison County, Illinois.

## EQUITABLE LIFE'S VARIABLE ANNUITY FUNDS

6. People invest in variable annuities for the same reasons people invest in mutual funds: their investment is pooled with those of thousands of other investors thereby achieving economies of scale that investors could not otherwise enjoy individually. For instance, investors can be collectively invested in a far more richly diversified portfolio of securities than they would be able to invest in individually; collectively they enjoy the benefits of professional management of their funds (such as investment research and daily monitoring of markets and securities) for a miniscule fraction of the cost they would pay individually because the costs are spread among thousands of investors; and, because large blocks of securities are traded on behalf of thousands of investors, trading transactional costs are vastly reduced because the transactional costs for the single "collective investor" are also spread among the thousands of actual investors invested in the fund. In addition, investors in variable annuities enjoy tax deferment on their investment, as well as a death benefit.

7. The Equitable Life annuities which are the subject of this Complaint consist of a "separate account" in which Equitable Life keeps investors' assets separate from Equitable Life's own assets.

8. Investors' funds in the separate account are the property of the investors and not the property of Equitable Life.

9. Each annuity's separate account is further divided into multiple sub-accounts, each of which corresponds to a single mutual fund.

10. Investors' funds in the sub-accounts are the property of the investors and not the property of Equitable Life.

11. Equitable Life invests the investors' funds in each sub-account in that sub-account's corresponding mutual fund. These mutual funds are maintained exclusively for variable annuity or

variable life insurance products, although they often bear names very similar to those of retail mutual funds.

12. Because the funds in the sub-accounts are investors' funds, when Equitable Life invests those funds in a mutual fund, the investors are the real owners of the shares of the mutual fund which Equitable Life only nominally holds in its name on behalf of and for the benefit of the investors.

13. Equitable Life credits each investor with "units" of the sub-accounts in which the investor's funds are invested.

14. Units in Equitable Life's sub-accounts can be traded, either by purchase or redemption, only once per day at 4:00 p.m. Eastern Time.

15. Equitable Life establishes a new daily "unit value" (UV) for each sub-account once every trading day at the close of trading on the New York Stock Exchange at 4:00 p.m. Eastern Time.

16. At the end of each trading day, Equitable Life (either directly or through a fund manager) valuates the assets in each mutual fund and establishes a "net asset value" for each mutual fund. That net asset value is the same net asset value Equitable Life uses to establish the corresponding sub-account's daily UV.

17. The two factors which have the largest influence on the UV are the value of the mutual fund portfolio and the total number of investors invested in that mutual fund (*i.e.*, the total number of investors who hold units in the sub-account which corresponds to any given mutual fund).

18. Because the sub-accounts' UV's are based upon the per share value of the underlying mutual fund, the value of an investor's sub-account units will fluctuate as the value of the corresponding mutual fund fluctuates.

19. Equitable Life contracts with fund managers who manage the mutual funds in which Equitable Life invests sub-account funds.

20. The fund managers handle the day-to-day tasks associated with managing an investment portfolio, such as investment management and valuation of the mutual fund's underlying portfolio of securities.

### EQUITABLE LIFE'S SUB-ACCOUNTS' CORRESPONDING MUTUAL FUNDS' PORTFOLIOS INCLUDE FOREIGN SECURITIES

21. Some of the mutual funds in which the annuity sub-accounts are invested include in their portfolios securities which are traded in markets outside of the United States.

22. In valuing the assets of a mutual fund, the fund manager uses the last trade price in the home market of each of the securities in its portfolio. The home markets for the foreign securities include London, Paris, Frankfurt, Moscow, Singapore, Kuala Lumpur, Hong Kong, Taipei, Tokyo and/or Sydney. These markets are located in time zones that are five to fifteen hours ahead of Eastern Time.

23. Thus, a five to fifteen hour interval elapses between the close of the foreign securities markets and Equitable Life's calculation of its sub-accounts' UV's.

24. For example, the exchange located in Tokyo, Japan observes normal trading hours of 9:00 a.m. to 3:00 p.m. local time. Active trading of securities traded on this exchange ends, and closing prices for those securities are posted, at 3:00 p.m. local time (2:00 a.m. Eastern time). When Equitable Life or its fund managers calculate the value of the mutual funds' portfolios, it uses any Japanese securities' closing prices in the Tokyo exchange. Thus, when Equitable Life calculates its sub-accounts UV's based upon the mutual fund valuation, Equitable Life necessarily incorporates the closing prices on the Tokyo exchange for any Japanese securities, closing prices that have been static for 14 hours.

25. Studies of world financial markets have established associations between the value changes among various markets. There is a positive correlation between value movements in the U.S. markets and value movements in foreign markets. If the U.S. markets experience an upward movement in values, it can be predicted that foreign markets will move upward once trading begins the next day. Similarly, if the U.S. markets experience a downward movement in values, it can be predicted that foreign markets will move downward once trading begins the next day.

26. Studies also demonstrate that the greater the percentage increase or decrease in the value of U.S. markets, the more likely foreign markets will post corresponding value movements on the subsequent trading day. The probability that the value movements of foreign markets will follow the previous day's value movements in U.S. markets is directly correlated to the degree or extent of the value movement of U.S. markets.

## EQUITABLE LIFE'S MISMANAGEMENT
## EXPOSES INVESTORS TO MARKET TIMING

27. A significant portion of the underlying securities in the mutual fund portfolios associated with the Equitable Life sub-accounts are listed on foreign exchanges and trade during each market's respective session.

28. When Equitable Life or its fund managers establish the share values of the mutual funds in which Equitable Life invests the sub-accounts' funds, they do not take into account on a daily basis any price relevant information (such as such as value movements in the U.S. markets, changes in world equity market indices, changes in the value of American Depository Receipts (ADRs), and fluctuations in foreign currency futures markets) that has become available in the interval between the close of the foreign markets and the calculation of the mutual funds' share values.

29. Such price relevant information is significant because the final market prices of the foreign securities often have become stale because they no longer reflect the current market value of the securities.

30. When the foreign securities prices are stale, Equitable Life's (or its fund managers') use of such stale prices of the foreign securities to calculate the UV causes the UV to be either artificially high or artificially low.

31. Equitable Life's calculation of artificially high or artificially low UV's exposed existing sub-account holders to market timing traders who regularly purchase and redeem units of Equitable Life's sub-accounts as part of a profitable, stale-price trading strategy.

5

32. Market timing is a short-term trading strategy by which the market timing trader takes advantage of the artificially low or high UV's. Because Equitable Life uses stale pricing of foreign securities to calculate mutual fund share values and thus sub-account UV's, market timers are able to predict changes in the UV's based on events that occur after the close of foreign securities markets but before the U.S. markets close.

33. Market timers buy units of Equitable Life sub-accounts on days when the U.S. markets move up, and they redeem units when the U.S. markets move down.

34. Due to Equitable Life's use of stale pricing, anyone who buys Equitable Life's sub-account units on days when the U.S. markets move up are buying units whose prices are artificially low, irrespective of whether the purchaser intends to market time. Similarly, anyone who redeems Equitable Life's sub-account units on days when the U.S. markets move down are redeeming units whose prices are artificially high, irrespective of whether the purchaser intends to market time.

**EQUITABLE LIFE'S FAILURE TO PROHIBIT MARKET TIMING
DILUTES HOLDERS' OWNERSHIP INTERESTS**

35. Every purchase of Equitable Life sub-account units at an artificially low UV dilutes the ownership interests of all existing sub-account holders because the purchaser acquires a larger percentage of ownership interest of the sub-account than the purchaser would have acquired had Equitable Life not used stale prices of foreign securities to calculate the UV.

36. Similarly, every redemption of Equitable Life sub-account units at an artificially high UV dilutes the ownership interests of all other existing sub-account holders because the redeemer depletes sub-account assets more than they would have been depleted had Equitable Life not used stale prices of foreign securities to calculate the UV.

37. Equitable Life's use of stale prices of foreign securities to calculate the UV does not, in and of itself, injure sub-account holders. Indeed, Equitable Life's methodology for calculating the UV could, at least theoretically, sometimes benefit holders to the extent that someone purchases units at an artificially

high UV or someone redeems units at an artificially low UV. Moreover, if no trading occurs on a day when the UV is artificially high or artificially low, holders are not injured.

38. Thus, it is Equitable Life's failure to prohibit purchases of sub-account units at an artificially low UV and redemptions of sub-account units at an artificially high UV which injures existing holders of sub-account units.

39. The wealth represented by market timing dilution comes exclusively and dollar-for-dollar out of the pockets of existing holders of sub-account units.

## PLAINTIFF AND CLASS MEMBERS
## HAVE NO FEDERAL SECURITIES LAW CLAIM

40. Stale price trading in Equitable Life annuity sub-accounts does not materially benefit Equitable Life, its directors, officers or employees.

41. With respect to market timing or stale price trading in its annuities' sub-accounts, Equitable Life did not make any untrue statement or fail to disclose any material fact in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in Equitable Life's annuities' sub-accounts.

42. With respect to market timing or stale price trading in its annuities' sub-accounts, Equitable Life did not use or employ any manipulative or deceptive device or contrivance in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in Equitable Life's annuities' sub-accounts.

43. No purchaser of Equitable Life's sub-account units is injured, in connection with his purchase, by any other purchaser's purchase of sub-account units at an artificially low UV.

44. No purchaser of Equitable Life's sub-account units is injured, in connection with his purchase, by any other trader's redemption of sub-account units at an artificially high UV.

45. No seller of Equitable Life's sub-account units is injured, in connection with the redemption of his sub-account units, by a purchaser's purchase of sub-account units at an artificially low UV.

46. No seller of Equitable Life's sub-account units is injured, in connection with the redemption of his sub-account units, by any other trader's redemption of sub-account units at an artificially high UV.

47. As a result, stale price trading does not injure purchasers or sellers of Equitable Life's sub-account units.

48. Accordingly, because Equitable Life, with respect to market timing or stale price trading in its annuities' sub-accounts, did not make an untrue statement, fail to disclose any material fact or use or employ any manipulative or deceptive device or contrivance in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in Equitable Life's annuities' sub-accounts Plaintiff and class members have no cause of action under federal securities law.

**STALE PRICE TRADING DOES NOT INJURE EQUITABLE LIFE
AND IS THEREFORE NOT A SHAREHOLDERS' DERIVATIVE CLAIM**

49. Market timing and stale price trading dilutes the value of investors' pooled investment in Equitable Life sub-accounts which, as alleged above, are the separate property of the investors and not the property of Equitable Life.

50. Market timing and stale price trading does not injure Equitable Life or its property.

51. As a result, the dilution that occurs through market timing and stale price trading injures shareholders directly.

52. Accordingly, Plaintiff brings this suit for mismanagement against Equitable Life as a direct action and not as a shareholders' derivative action.

**CLASS ACTION ALLEGATIONS**

53. Through his ownership of the Equitable Life Incentive Life 2000 Flexible Premium Variable Life Policy, Plaintiff at all times relevant to this Complaint held units in the Life Incentive Life 2000 Flexible Premium Variable Life Policy sub-account for the purpose of long-term investment.

54. Plaintiff brings this class action on behalf of himself and on behalf of a class of all persons in the United States who held (through their ownership of an Equitable Life annuity or insurance products) units

8

of any Equitable Life sub-account invested in mutual funds which included foreign securities in their portfolios and which experienced market timing or stale price trading activity.

      i. Excluded from the class are Equitable Life and any of its parent, subsidiary or affiliated corporations, as well as any of their controlled persons, officers, directors, agents, servants or employees, and the immediate family members of any such person; any judge who may preside over this case; all persons who have claims in excess of $75,000; and any investor who engaged in market timing trading in the Equitable Life sub-accounts which are the subject of this Complaint.

      ii. Excluded from this Complaint are any claims Plaintiff or any class member may have based upon Equitable Life's conduct in connection with Plaintiff's or any class member's purchase or sale of any Equitable Life annuity or insurance products.

55. Alternatively, if Equitable Life is found, with respect to market timing or stale price trading in its annuities' sub-accounts, to have made any untrue statement, failed to disclose any material fact, or used or employed any manipulative or deceptive device or contrivance, Plaintiff brings this class action on behalf of himself and on behalf of a class of all persons in the United States who, prior to Equitable Life's untrue statement, omission of material fact, use or employment of any manipulative or deceptive device or contrivance, held (through their ownership of an Equitable Life annuity or insurance products) units of any Equitable Life sub-account invested in mutual funds which included foreign securities in their portfolios and which experienced market timing trading activity.

      i. Excluded from the class are Equitable Life and any of its parent, subsidiary or affiliated corporations, as well as any of their controlled persons, officers, directors, agents, servants or employees, and the immediate family members of any such person; any judge who may preside over this case; all persons who have claims in excess of $75,000; and any investor who engaged in market timing trading in the Equitable Life sub-accounts which are the subject of this Complaint.

      ii. Excluded from this Complaint are any claims Plaintiff or any class member may have with respect to any purchase or sale of any Equitable Life annuity or insurance products after Equitable Life's untrue statement, omission of material fact, or use or employment of any manipulative or deceptive device or contrivance.

      iii. Also excluded from the class is any person whose only purchases of any Equitable Life annuity or insurance products all occurred after Equitable Life's untrue statement, omission of material fact, or use or employment of any manipulative or deceptive device or contrivance.

      iv. Also excluded from this Complaint are any other claims Plaintiff or any class member may have based upon EquitableLife's conduct in connection with Plaintiff's

        or any class member's purchase or sale of any Equitable Life annuity or insurance products.

56. Plaintiff is a member of the class and will fairly and adequately assert and protect the interests of the class. Plaintiff's interests are coincident with, and not antagonistic to, those of other class members.

57. Plaintiff has retained attorneys who are experienced in class action litigation.

58. Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiff cannot ascertain the exact number and identity of class members prior to discovery, on information and belief, there are thousands of class members and their identity can be ascertained from Equitable Life's books and records.

59. There are questions of law or fact common to the class.

60. Those common questions predominate over any questions affecting only individual members of the class.

61. Those predominating, common questions include, but are not limited to, the following:

    i. whether in calculating daily UV's Equitable Life negligently failed to evaluate on a daily basis price relevant information available after the close of the exchanges in which the securities held by the mutual funds' portfolios trade, but before the calculation of the daily UV, which was likely to change the value of the mutual fund securities and thus sub-account UV's;

    ii. whether in calculating daily UV's Equitable Life negligently failed to implement valuation and pricing policies and procedures which would account for price relevant events occurring after the close of the exchanges in which the securities held by the mutual funds' portfolios trade, but before the calculation of the daily UV, whenever closing prices of mutual fund portfolio securities did not reflect their current market values;

    iii. whether Equitable Life negligently failed to protect its sub-account holders from market timing or stale price trading;

    iv. whether Plaintiff and the class have sustained damages as a result of Equitable Life's negligence; and/or

    v. the proper measure of any such damages.

62. The prosecution of separate actions by individual members of the class would create a risk of:

    i. inconsistent or varying adjudications with respect to individual members of the class; and/or

    ii.    adjudication with the respect to individual members of the class, which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protest their interest.

63. The class action method is appropriate for the fair and efficient prosecution of this action.

64. Individual litigation of all claims, which might be brought by all class members, would produce a multiplicity of cases so that the judicial system would be congested for years. Class treatment, by contrast, provides a manageable means of bringing to rapid conclusion the claims of all persons with whom Plaintiff is similarly situated with respect to Equitable Life's negligence as alleged herein.

**COUNT I**
**(COMMON LAW NEGLIGENCE)**

65. Plaintiff repeats and incorporates by reference paragraphs 1 through 64 as if fully set forth here.

66. As a specialist in the field of investment management, it became Equitable Life's duty to exercise that degree of knowledge, skill and care ordinarily used, or which should be used, by reasonably well-qualified members of the investment management profession, including but not limited to the duties:

    i.    to use mutual fund share values predicated upon current market values when valuing sub-accounts and setting their daily UV's; and/or

    ii.    to prevent market timing and/or stale price trading in sub-accounts to prevent the dilution of the ownership interests of existing sub-account holders.

67. Equitable Life knew or should have known that the closing prices for the foreign securities held in its sub-accounts' corresponding mutual funds' portfolios did not represent current market values of those foreign securities whenever price relevant events had occurred after the closing of foreign securities markets but before Equitable Life's calculation of daily UV's.

68. Equitable Life was negligent in one or more of the following ways:

    i.    failing to evaluate on a daily basis price relevant information available to Equitable Life after the close of foreign securities markets in which the underlying mutual funds' portfolios of securities traded;

    ii.    failing to adjust calculation of daily UV's to take into account any changes in value of the foreign securities held in the underlying mutual funds' portfolios whenever price relevant events occurred after the closing of the foreign securities markets but before Equitable Life's calculation of daily UV's; and/or

    iii.    <u>failing to implement policies and procedures which would protect sub-account holders such as Plaintiff and class members from the dilution effect of market timing and/or stale price trading.</u>

69. As a direct and proximate result of Equitable <u>Life's</u> negligence, Plaintiff and the class have suffered damages in an amount to be proven at trial, but less than $75,000 per plaintiff or class member, including all compensatory damages and costs.

WHEREFORE, Plaintiff requests that the Court certify this action as a class action, enter judgment in favor of Plaintiff and the class and against AXA EQUITABLE LIFE INSURANCE COMPANY f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, and award Plaintiff and the class compensatory damages, prejudgment interest and costs of suit in an amount not to exceed $75,000 per plaintiff or class member. Plaintiff demands a trial by jury

        Respectfully submitted,

        ___/s Robert L. King_____
        Robert L. King #6209033
        701 Market Street, Suite 350
        St. Louis, MO 63101
        Telephone:  314/621-4012
        Facsimile:   314/621-2586

        KOREIN TILLERY
        Stephen M. Tillery #2834995
        Eugene Barash # 6280933
        701 Market Street, Suite 300
        St. Louis, MO 63101
        Telephone:  314/241-4844
        Facsimile:   314/241-3525

        KOREIN TILLERY
        George A. Zelcs #3123738
        Three First National Plaza
        70 West Madison, Suite 660
        Chicago, Illinois 60602
        Telephone: 312/641-9750
        Facsimile:  312/641-9751

        BONNETT, FAIRBOURN,
        FRIEDMAN & BALINT, P.C.
        Andrew S. Friedman
        Francis J. Balint, Jr.
        2901 N. Central Avenue, Suite 1000
        Phoenix, AZ 85012
        Telephone:  602/274-1100
        Facsimile:   602/274-1199

        LERACH COUGHLIN STOIA
        GELLER RUDMAN & ROBBINS LLP
        John J. Stoia, Jr.
        Timothy G. Blood
        William J. Doyle II
        Amelia F. Burroughs
        401 B Street, Suite 1700
        San Diego, CA  92101
        Telephone: 619/231-1058
        619/231-7423 (fax)

        ***Attorneys for Plaintiff and the Class***

## CERTIFICATE OF SERVICE

The undersigned certifies that service of the aforementioned instrument was made by means of the Notice of Electronic Filing on June 10, 2005, to the following counsel of record:

**Sheila Finnegan**
Mayer, Brown et al. - Chicago
190 South LaSalle Street
Suite 3900
Chicago, IL 60603-3441
sfinnegan@mayerbrown.com

**Maggie J. Schneider**
Mayer, Brown et al. - Chicago
190 South LaSalle Street
Suite 3900
Chicago, IL 60603-3441
mschneider@mayerbrownrowe.com

**Deborah A. Hawkins**
Heyl, Royster et al. - Edwardsville
Generally Admitted
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
dhawkins@hrva.com

**Robert H. Shultz, Jr.**
Heyl, Royster et al. - Edwardsville
Generally Admitted
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
rshultz@hrva.com

**Richard K. Hunsaker**
Heyl, Royster et al. - Edwardsville
Generally Admitted
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
rhunsaker@hrva.com

and via first class U.S. mail to:

**Michele Odorizzi**
Mayer, Brown et al. - Chicago
190 South LaSalle Street
Suite 3900
Chicago, IL 60603-3441


                              /s/ Robert L. King